**R. C. WALL, O. D., et al.,**
**Plaintiffs,**

v.

The **AMERICAN OPTOMETRIC ASSO-CIATION, INC., an Ohio corporation, et al., Defendants.**

**Earnest Earl JUSTICE, Jr., O. D.,**
**Plaintiff,**

v.

The **GEORGIA STATE BOARD OF EX-AMINERS IN OPTOMETRY et al., Defendants.**

**Civ. A. Nos. 16414, 18680.**

United States District Court,
N. D. Georgia,
Atlanta Division.

April 19, 1974.

Judgment Affirmed Oct. 21, 1974.
See 95 S.Ct. 166.

Gambrell, Russell, Killorin, Wade & Forbes, Haas, Holland, Levison & Gibert, Lanier & Elliott, Atlanta, Ga., for plaintiffs.

Arthur K. Bolton, Atty. Gen., Atlanta, Ga., for State Bd. of Examiners in Optometry.

Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for Ga. Optometric Ass'n, Inc. and its officers.

Sutherland, Asbill & Brennan, Atlanta, Ga., for American Optometric Assn.

Lavender & Cunningham, Elberton, Ga., for defendants.

Before MORGAN, Circuit Judge, and SMITH and HENDERSON, District Judges.

LEWIS R. MORGAN, Circuit Judge:

Plaintiffs in two cases in this court have attacked the validity of rules promulgated by the Georgia State Board of Examiners in Optometry. The cases have been combined in order that a three-judge district court convened pursuant to 28 U.S.C. § 2281 could consider the common constitutional issues of the cases. Finding that this court has jurisdiction to consider the claims of the plaintiffs, and finding further that certain procedures of the board are inconsistent with the Constitution, we grant the relief requested by the plaintiffs.

## I. FACTUAL BACKGROUND

The approximately 300 optometrists in Georgia may be loosely grouped into two categories: "dispensing" and "prescribing." Dispensing optometrists distribute eyeglass lenses and frames; prescribing optometrists do not. Most dispensing optometrists are members of the Georgia Optometric Association (GOA), a private organization. Section II(A) of the Code of Ethics and Rules of Practice of the GOA provides:

> No member shall practice in any business establishment, regardless of whether the same be subdivided, or in or on premises where any materials other than those necessary to render his professional services are dispensed to the public.

Thus, none of the 200 or so members of the GOA is associated with any business establishment. Most non-members of the GOA, on the other hand, are prescribing optometrists. They are often associated with commercial enterprises, either those which sell eyeglass lenses and frames primarily or department stores with optical departments.

The Georgia State Board of Examiners in Optometry (the Board) regulates the practice of optometry in Georgia.[1] Its primary function is to control entry into the profession by licensing optometrists who wish to practice in the state. No person may practice optometry in the state without a license from the board, and anyone who practices without a license commits a misdemeanor.[2] Thus, the board has complete control over who may enter the optometry profession in Georgia.

The governor appoints the five members of the board, who must be optometrists practicing in the state.[3] Although the governor may appoint any licensed optometrist in Georgia to the board, the GOA has always recommended its members to the governor for appointment and each of the present members of the board was appointed by the governor after such a recommendation. Each of the board members is an active member of the GOA and subscribes to its Code of Ethics and Rules of Practice, including Section II(A), quoted above. Thus, the board is and always has been completely controlled by members of the GOA, whose approximately 200 members have very different economic interests than those of the 100 non-members, and who constitute an identifiable category within the optometry profession.

## II. PROCEDURAL FRAMEWORK

Pursuant to its statutory authority, the board has from time to time promulgated regulations relating to the practice of optometry.[4] Its Rule 430–4 governing unprofessional conduct was originally filed June 30, 1965. On February 4, 1972, the board gave notice of intent to adopt certain rules and regulations, and scheduled a meeting for April 12, 1972, "for the purpose of adopting rules and regulations." Among the rules proposed at that time was an amendment to Rule 430–4 which would prohibit the practice of optometry in an office for less than a specified minimum number of hours per week, and would prohibit practicing optometry in an office which is "reasonably identifiable" with a mercantile establishment, retail optical supply house or dispensing optician so as to gain patronage by virtue of such location. After public hearings, at which many people expressed their opinions, the board adopted the amendments, which became effective December 6, 1972. The effect of the amendments, which are quoted in the margin,[5] is to

---

1. See, generally, Ga.Code Ann., Ch. 84–11. Ga.Code Ann., § 84–1105, provides that, "All persons engaged in the practice of optometry or who wish to begin practice of same shall make application . . . to the State Board of Examiners in Optometry to be registered and for a certificate of registration."

2. Ga.Code. Ann., § 84–1107 provides, "It shall be unlawful for any person to practice optometry in this State unless he shall have first obtained a license from the State Board of Examiners and filed same with the clerk of the superior court of the county in which such practice is conducted." In addition, "Any person who practices, offers or pretends to practice, or holds himself out as eligible to practice optometry, and who is not legally registered and licensed, shall be guilty of a misdemeanor, and shall be punished as for a misdemeanor for each day or fraction of a day that he practices in violation of Chapter 84–11." Ga.Code Ann., § 84–9917.

3. See, Ga.Code Ann., § 84–1102.

4. Ga.Code Ann., § 84–1110.1 authorizes the board to "adopt, establish, enforce and maintain" rules relating to the practice of optometry.

5. The amended rules prohibit, *inter alia*, the following practices by declaring them to be "unprofessional conduct" within the meaning of Ga.Code Ann., § 84–1110. That section authorizes the board to revoke the license of a person guilty of unprofessional conduct. Rule 430–4–.01(2)(g):
 —; The public display of the licensed optometrist's name upon or in any premises used for the practice of optometry, unless said optometrist is actually present and engaged in the practice of optometry at such premises for a minimum of four (4) hours per week.
 Rule 430–4–.01(3)(e):
 (e) "Regularly deriving patronage for himself as result of the advertising or merchandising activities of a mercantile or business establishment, including a dispensing optician, which sells merchandise

force many optometrists to adopt significant changes in their practices, since it has been common for prescribing, but not dispensing, optometrists to establish several offices in connection with retail establishments and move from office to office during the course of a week.

On March 31, 1972, nine optometrists filed civil action No. 16414. They sought to have the proposed rules enjoined on the grounds that the board, because it consisted of practicing optometrists, had an economic interest in the promulgation of the rules, and the rules were therefore void. This court denied relief, on the ground that there is "no *federal constitutional* requirement to the effect that legislators and rule makers must be free of bias or interest. . . ." [Emphasis in original]. The court added, "There remains the right of plaintiffs to seek an injunction against enforcement of any regulations adopted by the Board on the police power question and the right of any individual to raise the due process question if he is disciplined for its violation." After the entry of judgment in the suit, the board proceeded to adopt its regulations. On November 29, 1973, the board, through the joint secretary (see Ga.Code Ann., § 84–101) issued a notice of hearing directed to Earnest L. Justice, plaintiff in No. 18680. This notice notified Justice that a hearing would be held February 20, 1974, "to determine whether, upon proof of the charges listed below, an appropriate sanction should be imposed with respect to your license to practice optometry." The notice asserted that plaintiff Justice had, in July, 1973, opened an office for the practice of optometry on the premises of the Sears, Roebuck Department Store in

Cumberland Mall, Cobb County, Georgia, and by practicing optometry at this location, plaintiff Justice was violating the board's rule regarding commercialism. On the same day, the board issued an identical notice to David Jacobs, one of the plaintiffs in action No. 16414. Plaintiff Jacobs' office is in the Rich's Department Store in Cumberland Mall.

The registration revocation proceedings involved in these suits are controlled by the Georgia Administrative Procedure Act, Ga.Code Ann., § 3A–101 et seq. Specifically, § 3A–114(a)(5) provides,

> Unless specifically precluded by statute, in addition to the agency, any contested case may be held before any agency representative who has been selected and appointed by the agency for such purpose. Before appointing a hearing representative, the agency shall determine that the person under consideration is qualified by reason of training, experience and competence.

According to § 3A–102(b), the term "contested case" includes licensing proceedings such as those involved in this case. Section 3A–118(a) provides that when such a representative makes a decision in a case, his decision becomes the decision of the agency unless a party applies to the agency for review within 30 days, or the agency within 30 days reviews the decision on its own motion. Under § 3A–120, the decision of an agency may be appealed by an aggrieved person who has exhausted all administrative remedies. Review may be had in the Superior Court of Fulton County or in the superior court of the county of residence of the petitioner. § 3A–120(b). According to § 3A–120(h), the superior court may reverse or modify

---

to the general public by establishing or maintaining his professional optometry office in such a location or manner as to be reasonably identifiable with or as part of such retail mercantile or business establishment." The purpose of this subsection is to insure that the practice of optometry shall be carried out in such a manner that it is completely and totally separated from the business of any such mercantile estab-

lishment, with no control of the optometrist by such mercantile establishment and no solicitation for the optometrist by such mercantile establishment.

The latter rule contains a "grandfather clause" exempting optometrists practicing in violation of this rule at the time of its promulation if they meet certain specific criteria.

the decision if the agency's decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

In the board's cases against Doctors Justice and Jacobs, it has employed John A. Sligh, Jr., Esq., as the agency representative to hear the cases initially. Mr. Sligh is a former Assistant Attorney General for the State of Georgia, and is now employed by the Department of Transportation of the state, where his functions include serving as a hearing officer in administrative proceedings under the Georgia Administrative Procedure Act. Mr. Sligh is conceded to have no ties with or relationship to any plaintiff or any defendant or with any optometrist, nor has he ever represented or provided legal service to the state board or any of its members.

Legal services are provided to the board by the state law department, headed by the Attorney General of Georgia, and by private attorneys employed by the state law department as Special Assistant Attorneys General. The Assistant Attorney General currently assigned to the state board will prosecute the proceedings which have been brought against Doctors Justice and Jacobs. The state board has announced that if the decision of the hearing officer in these two cases is contrary to the matters of fact and law asserted by this Assistant Attorney General, the state board will not permit him to seek review before it (as he is permitted to do by § 3A–118(a)), nor will the board review any decision of the hearing officer favorable to either optometrist.

## III. JURISDICTION

██ As always, the first question to which the court must address itself is that of jurisdiction. Ex parte McCardle, 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1869). Plaintiffs assert that the defendants threaten to violate their rights under the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983. Plaintiffs in No. 16414 assert jurisdiction under 28 U.S.C. § 1343; plaintiff in No. 18680 asserts jurisdiction under 28 U.S.C. § 1343(3) and (4), and under 28 U.S.C. § 1331(a). Plaintiff in No. 18680 also seeks a remedy under the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202. The court finds that it has jurisdiction to hear all the claims presented.

## IV. STANDING

In their two supplemental memoranda filed in this court, defendants argue that various plaintiffs lack standing as to some or all of the claims presented.

██ First, Doctors Justice and Jacobs obviously have standing to argue the invalidity of the board procedures, because license revocation proceedings have already been instituted against them.

Next, Doctors Justice and Jacobs are accused of violating the specific prohibition of Rule 430–4–.01(3)(e)(2), so they have standing to contest its validity. In addition, plaintiffs attack the "preamble" to Rule 430–4–.01(3)(e).

██ Defendants argue strenuously that none of the plaintiffs have standing to contest the validity of the preamble because no one has been specifically charged with violating its prohibitions. Nevertheless, several of the plaintiffs are stipulated to practice "in near geographical proximity" to Pearle Optical offices. The board correctly argues that this may not in itself bring them within the ambit of the rule, but we believe it makes it sufficiently likely that they will be subjected to board sanctions in the future that they should be allowed to

assert their claims. Also, defendants concede that Doctor Wall, plaintiff in No. 16414, displays his name at 16 locations, each located near a Pearle Vision Center, and that he does "not regularly practice optometry at any one of those offices." Instead, he practices in these offices as necessary because of illness or vacation of the licensed optometrists who ordinarily work there full time, each of whom is employed by Doctor Wall. This kind of practice obviously constitutes a potential violation of Rule 430–4–.01(2)(g). Finally, the board asserts that plaintiffs who are not the subject of pending license revocation proceedings do not have standing to challenge any of the rules. This position is clearly refuted both by the Supreme Court's recent decision in Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) and by the congressional scheme of allowing anticipatory challenge to state proceedings in certain circumstances. If the mere lack of pending state proceedings served to deprive plaintiffs of standing to contest regulatory schemes, plaintiffs would invariably be trapped between Scylla and Charybdis of standing and the doctrine of equitable retraint, discussed below. Such a system would defeat Congress' policy of allowing anticipatory challenges to state proceedings. For the reasons discussed in Section VI, *infra*, the court finds that proceedings are threatened against all the optometrists in the state whose practice of optometry arguably violates the board's rules. Plaintiffs do have standing to challenge the validity of those rules and the procedures being used to enforce them. That all plaintiffs do not have standing to contest every rule is immaterial.

## V. ABSTENTION

Before reaching the merits of the case, the court is confronted with the argument that it must abstain from rendering a decision in these cases because of notions of comity and federalism.[6]

What is loosely referred to as absention is in fact an amalgam of several different doctrines of equity, comity, federalism. Though these doctrines are frequently discussed and analyzed together without proper consideration of their various and sometimes conflicting policies, they are best analyzed separately. We first consider the possible applicability of classical abstention theory, also referred to as the Pullman doctrine. Railroad Commission of Texas v. Pullman Company, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The usual procedure in a case in which this doctrine is employed is to withhold decision pending the state court determination of certain issues in the case. See, 1A Moore, Federal Practice, Para. 0.203, Hart & Wechsler, Federal Courts and the Federal System, 2d Ed. (1973) 985–97. The purpose of this doctrine is to avoid unnecessary federal interference with the administration of state laws and to give the state courts an opportunity to pass on uncertain questions of state law which may eliminate the necessity for, or at least narrow, federal intervention.

Classical abstention theory requires a court to withhold judgment if its ruling would involve a tentative answer to an unsettled question of state law which might be displaced immediately by a state adjudication. Railroad Commission of Texas v. Pullman Company, *supra*; Glenn v. Field Packing Co., 290 U.S. 177, 54 S.Ct. 138, 78 L.Ed. 252 (1933); Lee v. Bickell, 292 U.S. 415, 54 S.Ct. 727, 78 L.Ed. 1337 (1934). However, federal courts are frequently required to resolve difficult issues of state law, Siler v. Louisville & Nashville Railroad, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909), and the difficulty of the task is no reason for a federal court failing to adjudicate an issue, Cohens v.

6. It may be noted preliminarily that insofar as plaintiffs' claims under 42 U.S.C. § 1983 are concerned, the anti-injunction statute, 28 U.S.C. § 2283, does not apply. Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

Virginia, 6 Wheat. (19 U.S.) 264, 5 L. Ed. 257 (1821). Neither does the fact that the statute may be new and untested in the state courts. Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Chicago v. Atchison, T. & S. F. Ry., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958); Doud v. Hodge, 350 U.S. 485, 76 S.Ct. 491, 100 L.Ed. 577 (1956).

■ In this case, the law is not sufficiently unsettled or uncertain to warrant abstention, and the defendants have not demonstrated that our adjudication of the case would be furthered significantly by an intervening decision of the Supreme Court of Georgia. A federal court need not, and should not, abstain in a case in which a construction of the statute by the state court would not be helpful in deciding the federal constitutional question. Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). Plaintiffs here allege that the regulations of the board infringe upon their right to due process of law, both because the rules being enforced are themselves arbitrary, and because the state has failed to provide them with an impartial tribunal to hear the charges against them. We do not see how a decision of the Georgia Supreme Court would make our determinations of these questions any easier. It is true that there are certain issues of state law in the case which, if decided favorably to the plaintiffs, would dispose of the case. For example, plaintiffs argue that the rules they challenge are beyond the scope of legislative authority which has been delegated to the board by the legislature. If this contention were upheld, the rules would be struck down and the other issues in the case would be moot. But that is not enough. It is true in many cases that there are state law contentions which could dispose of the case. The fact remains that plaintiffs allege a violation of their federal constitutional rights, for which violation Congress has provided a forum in the federal district courts. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

Defendants argue that abstention is called for by the case of Geiger v. Jenkins, 316 F.Supp. 370 (N.D.Ga.1970), aff'd, 401 U.S. 985, 91 S.Ct. 1236, 28 L. Ed.2d 525 (1971). *Geiger* was an action for damages and declaratory and injunctive relief brought under 42 U.S.C. §§ 1983, 1985 and 1988. The plaintiff was a doctor who faced license revocation proceedings before the Board of Medical Examiners of Georgia. A three-judge court rebuffed Dr. Geiger's claim for relief because of 28 U.S.C. § 2283 (the case predated Mitchum v. Foster, n. 6, *supra*,) and the doctrine of abstention, and also dismissed the complaint for failure to state a claim upon which relief can be granted.

Although *Geiger* is similar to the case at bar, we must decline to follow its holding on abstention, not only because abstention was only one of three alternative grounds for the decision, but also because we read the later case of Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), as disapproving, if not overruling, the abstention aspect of the case. Although the Court discussed and distinguished *Geiger* in the section of *Gibson* dealing with Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), it failed even to mention the case in the abstention section of the opinion. The best that can be said for the Supreme Court's decisions in the area of abstention is that they have been difficult to reconcile with each other. We find more guidance in the Court's decision to affirm the district court's failure to abstain in *Gibson* than its concededly opaque (411 U.S. at 576, 93 S.Ct. at 1696, 36 L.Ed.2d at 498) summary affirmance of *Geiger*.

■■ It cannot be emphasized too strongly that abstention, unlike the quasi-jurisdictional requirements of 28 U. S.C. § 2283, Alabama Public Service Commission v. Southern Railway Company, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), is left in the discretion of the district court, Railroad Commission of Texas v. Pullman Co., *supra*, and should be exercised only in those rare

circumstances in which the district court believes it would further the goals of federalism without interfering with Congress' intention to provide a federal forum for the vindication of federal rights. Zwickler v. Koota, *supra*. We do not feel that this is the sort of a case in which abstention is justified. See, Wisconsin v. Constantineau, *supra*. In addition, although abstention is not foreclosed in civil rights cases, Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959), it is disfavored in such cases. Moreno v. Henckel, 431 F.2d 1299 (5th Cir. 1970).

The general rule, as stated above, is that a federal court possessed of jurisdiction over a cause of action should afford relief to a plaintiff whose rights have been violated. It is only in the most extraordinary circumstances that it should fail to give relief when Congress and the Constitution have empowered it to do so. We are not convinced that the circumstances of this case warrant a failure to give such relief. As this court has noted previously, "every constitutional right under every circumstance is not to be put on ice awaiting the hearing on the anvils of state adjudication." Hobbs v. Thompson, 448 F.2d 456, 462 (5th Cir. 1971).

## VI. EQUITABLE RESTRAINT

The second factor we must consider is the general doctrine that a federal court should not interfere with state criminal proceedings absent unusual circumstances. Younger v. Harris, *supra*; Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).[7] This doctrine is separate from classical abstention theory, although it does involve the consideration of the proper relationship between federal and state courts. It also involves the question of timing; i. e., Should a defendant

be permitted to make an anticipatory attack on an allegedly unconstitutional state criminal statute, or should a person seeking to challenge a statute be required to await prosecution and assert the invalidity of the statute as a defense? Our first inquiry is whether the proceedings being objected to are criminal. For the answer to this question, we must look to Georgia law. Gibson v. Berryhill, *supra*; Polk v. State Bar of Texas, 480 F.2d 998, 1001 (5th Cir. 1973).

In Georgia, medical license revocations are "in the nature of criminal proceedings." Geiger v. Jenkins, *supra*, 316 F.Supp. at 372; Hughes v. State Board of Medical Examiners, 158 Ga. 602, 123 S.E. 879 (1924); State Board of Medical Examiners v. Lewis, 149 Ga. 716, 102 S.E. 24 (1920). We find nothing in the case law to distinguish a license to practice medicine from a license to practice optometry. In fact, Georgia has attempted to professionalize the practice of optometry, which indicates a state policy to treat both groups in the same manner. Therefore, we must treat these proceedings as criminal. Pearle Optical of Monroeville v. State Board of Examiners in Optometry, 219 Ga. 364, 133 S.E.2d 374 (1963). Ga.Code Ann., § 84–1101. Palaio v. McAuliffe, 466 F.2d 1230 (5th Cir. 1972).

The next question is whether the "criminal" proceedings are *pending*. The stipulated evidence demonstrates that the board has sent notices of license revocation hearings to Doctors Justice and Jacobs, and has refrained from acting pursuant to those notices only because of these actions. No revocation hearing notices have been sent to any other optometrists, although the board has made clear its intention to "cleanse" the profession of optometrists who violate the regulations. Thus, the proceed-

---

7. At oral argument, counsel for the board specifically abjured any reliance on Younger v. Harris. Regardless of whether this concession was meant to apply to the abstention aspect of the case or the use of the doctrine of equitable restraint, the court considers itself bound by both doctrines. A party may not waive a rule of law based on a doctrine designed to assure the proper role for the federal courts in the federal system and minimize interference with the judicial processes of the state.

ings are "pending" with respect to Doctors Justice and Jacobs and only "threatened" with respect to the other optometrists operating in violation of the new board rules, who are stipulated to be approximately 50 in number.

## A. NO. 18680.

The only plaintiff in No. 18680 is Dr. Earnest Justice, Jr. Doctor Justice has requested both injunctive and declaratory relief, but, as we have just found, a state proceeding in the nature of a criminal proceeding is pending against him. Thus, unless bad faith, harassment, or other unusual circumstances are present, neither kind of relief is available. Younger v. Harris, *supra*; Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

Neither bad faith nor harassment is alleged to exist in this case, but the Court in *Younger* recognized that other circumstances may exist which would justify equitable relief, even in the face of a pending state prosecution. "There may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment." 401 U.S. at 53, 91 S.Ct. at 755. See also, Pugh v. Rainwater, 483 F.2d 778 (5th Cir. 1973).

In *Younger* there were no "extraordinary circumstances" or "irreparable injury" which could justify federal interference. One of the main reasons for this lack of irreparable injury was that the conduct violative of state law had already occurred. Since the conduct had already occurred and a state prosecution against it had already been instituted, there was little, if any, justification for federal intervention. It could not be argued that the plaintiff would be deterred from any actions, since the actions had already taken place. In addition, the plaintiff had already placed himself in peril of state prosecution, so that federal intervention could not aid him by allowing him to challenge the statute without violating it.

This case is different. Although Doctor Justice has already engaged in conduct allegedly violative of the statute, his is a continuing course of conduct. Federal intervention here can aid him by providing an advance determination of the validity of the statute so that Doctor Justice can, if he so chooses, alter his conduct to conform to the law. The board has conceded in its brief that,

> Indeed, State law may well foreclose revocation in any proceeding initiated by the State Board where the respondent demonstrates correction of a non-wilful violation of Board rules before the time of the hearing. Ga. Code Ann. § 3A–119(c); II F. Cooper, State Administrative Law, 496–498 (1965).

For this reason, federal intervention even after a notice of hearing has been issued, can serve an important purpose. By allowing Doctor Justice to obtain an advance determination of the validity of the optometry regulations, we permit him to challenge the statute without risking his very means of earning a living. To permit this mode of challenge is consistent with and in furtherance of the role of the federal courts as the primary guardians of constitutional rights. See Perez v. Ledesma, 401 U.S. 82, 104, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring). We intervene here because Doctor Justice will suffer irreparable injury absent an advance determination of the validity of the statute scheme, and this injury provides the "unusual circumstances" necessary to distinguish this case from *Younger*.

## B. NO. 16414.

The various plaintiffs in No. 16414 have injunctive but not declaratory relief. The board has instituted proceedings against one of the plaintiffs in this case, Doctor David Jacobs. He is thus in the same position as Doctor Justice, plaintiff in No. 18680. For the reasons stated above, injunctive relief is available to him because, although state criminal proceedings are pending against

him, the court finds that absent federal intervention, he will suffer irreparable injury sufficient to justify this interference with the operations of state law.

The plaintiffs in No. 16414 other than Doctor Jacobs are in an even stronger position to ask for federal intervention. Because they are engaged in the same kind of continuing course of conduct as Doctors Justice and Jacobs, they will suffer irreparable injury unless this court intervenes. But the granting of their requests for relief will cause significantly less interference with the state statutory scheme because no proceedings have been instituted against them. Although the Supreme Court has not answered the question of whether the principles of Younger v. Harris, *supra*, prohibit federal intervention when no state prosecution is pending and injunctive relief is requested, the Court has decided that intervention is not prohibited when only declaratory relief is requested. Steffel v. Thompson, *supra*.

Steffel had on two occasions distributed handbills at a shopping center near Atlanta protesting American involvement in the Viet Nam war. On both occasions he had been threatened with arrest for violating Georgia's criminal trespass statute, and on the second occasion, his companion was arrested. Steffel requested federal injunctive and declaratory relief against the county solicitor, the county chief of police, and the owner and manager of the shopping center, seeking to enjoin them from enforcing the statute against him so as to violate his rights under the First Amendment to the Constitution, and also seeking a declaration that the trespass statute as applied to him was unconstitutional. The district court denied all relief, Becker v. Thompson, 334 F.Supp. 1386 (N.D.Ga.1971), and Steffel appealed only the denial of declaratory relief. The Fifth Circuit, 459 F.2d 919 (1972), held that Samuels v. Mackell, *supra*, required it to use identical standards for injunctive and declaratory relief, and that the principles of *Younger* forbid federal intervention in threatened as well as pending state prosecutions. Thus, the Court of Appeals reasoned, the district court properly denied the request for declaratory relief.

The Supreme Court reversed. 415 U. S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505. The Court held that at least with respect to a request for declaratory relief, the principles of Younger v. Harris did not forbid federal intervention where no state prosecution was pending. The Court also restated the proposition that the same irreparable injury that is required to support an injunction is not required when only declaratory relief is requested (except, of course, when a state prosecution is pending, in which case the standards of *Younger* apply to both injunctive and declaratory relief).

■ In this case, the request for an injunction by the plaintiffs in No. 16414 other than Doctor Jacobs presents this question: Does the holding of Steffel v. Thompson, that the limitations of Younger v. Harris do not apply to requests for federal declaratory relief when no state action is pending apply to requests for injunctive relief as well? Although the Court expressly pretermitted the answer to this question in *Steffel*, we conclude that the logic of the opinion requires us to answer the question in the affirmative.

*Steffel* was not based primarily on the proposition that a declaratory judgment was proper in the circumstances of that case because declaratory relief interfered less with the administration of state laws than would an injunction. Rather, *Steffel* reaffirmed the principle of Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 509, 92 S.Ct. 1749, 32 L. Ed.2d 257 (1972) that the principles of equity, comity and federalism "have little force in the absence of a pending state proceeding." 415 U.S. at 462, 94 S.Ct. at 1217.

*Steffel* re-emphasized the role of the federal courts as protectors of federal rights. When a federal court is asked to determine the legality of a state's actions, two different values come into conflict.

The first value is the idea that federal courts should protect federal rights against infringement by the states. The conflicting notion is that to the maximum extent possible, states should administer their own systems of law, subject only to minimal interference from the central government. The cases of *Younger* and *Steffel* represent a compromise between these two important values.

If the *Younger* rule did not exist, litigants could use federal court proceedings to paralyze state criminal proceedings. Pre-trial motions could be litigated in federal court. State procedures could be tested in federal court without the highest state court having a chance to interpret the relevant statutes. Many issues in a case would have to be litigated repeatedly in different forums. On the other hand, if federal intervention were forbidden by the tiniest hint of any state action, the purpose of Congress in allowing litigants to obtain injunctive relief against infringements of their rights, as authorized by 42 U.S.C. § 1983, would be completely frustrated. The middle position is that federal interference is forbidden except under unusual circumstances once a state prosecution has actually started, but it is permitted until the actual inception of the proceedings. Were the rule against interference extended any further, litigants would be caught between *Younger* on the one hand, and the rules requiring standing and an actual "case or controversy" on the other. Such a Hobson's choice would frustrate both congressional intent and a workable system of federalism. It is for this reason that the rule of Steffel v. Thompson must apply equally to requests for injunctive and declaratory relief.

It may be objected that had the Court intended the *Steffel* rule to apply also to injunctive proceedings, it would not have spent so much time and energy discussing the history and beneficent effects of the Declaratory Judgments Act, 28 U.S.C. §§ 2201–2202. The answer to this objection may be found in the history of the *Steffel* case. In addition to

holding that *Younger* applied to threatened state prosecutions, the Fifth Circuit held in Becker v. Thompson that because of Samuels v. Mackell, injunctive and declaratory relief were governed by the same standards even when no prosecution is pending. 459 F.2d at 922. Therefore, once the Court had decided that *Younger* itself did not apply and no considerations of federalism were present, there was no reason to use the same standards for injunctive and declaratory relief. When no state prosecution is pending, not only are the unusual circumstances of *Younger* not needed to justify declaratory relief, even the traditional standard of irreparable injury need not be met. In short, the long discussion of declaratory judgments in *Steffel* served merely to rectify the double misunderstanding of the Fifth Circuit's opinion in the case, not to indicate that in the absence of a pending state proceeding, *Younger* might apply to a request for an injunction.

Nevertheless, it is necessary for these plaintiffs, who are requesting an injunction, to demonstrate irreparable injury. This is so not because of anything having to do with federalism or comity. It is merely a traditional requirement of an equity court asked to issue an injunction. Plaintiffs here easily meet this standard of irreparable injury, as demonstrated by the discussion, *supra*, of the necessity of allowing federal intervention to provide an advance determination of the validity of the board's rules. Plaintiffs will unquestionably suffer irreparable injury unless this court acts, and therefore an injunction in the circumstances of this case is proper.

## VII. BOARD BIAS VIOLATES DUE PROCESS CLAUSE

Plaintiffs in these cases have launched an all-out attack on the Georgia procedure for regulating the practice of optometry. In. summary, they make the following arguments:

1. The procedure deprives them of their right to procedural due process of law because the members of the board

are economically interested in the results of the cases they hear, and are biased.

2. The rules governing the practice of optometry exceed the powers of the state, and violate plaintiffs' rights to substantive due process.

3. The rules are penal in nature, and are void for vagueness because they give insufficient notice of what conduct is prohibited.

4. The regulatory scheme deprives optometrists of equal protection of the laws because they are subject to rules to which ophthalmologists are not subject.

5. The rules confiscate plaintiffs' property without compensation, in violation of the Fifth and Fourteenth Amendments.

6. The rules exceed the power of the board because the legislature has not delegated to it the power to promulgate them.

7. To the extent that the legislature has delegated to the board the power to make the rules, that delegation is illegal under the Georgia Constitution.

We find that plaintiffs are correct in their first challenge, that the procedure employed deprives them of their right to an impartial tribunal. We also find, however, that the rules themselves are a valid exercise of the board's power over the optometry profession in Georgia, and that plaintiffs' other constitutional claims are without merit.

 It is one of the mainstays of our system of laws that a state cannot affect a person's personal or property rights except after a hearing before a fair and impartial tribunal. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L. Ed.2d 556 (1972). In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921). A fair and impartial tribunal requires at least that the trier of fact be disinterested. Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), and that he also be free from any form of bias or predisposition regarding the outcome of the case, Pillsbury Co. v.

FTC, 354 F.2d 952 (5th Cir. 1966); N. L.R.B. v. Phelps, 136 F.2d 562 (5th Cir. 1943). Not only must the procedures be fair, "the very appearance of complete fairness" must also be present. Amos Treat & Co. v. SEC, 113 U.S.App.D.C. 100, 306 F.2d 260, 267 (1962). These principles apply not only to trials, but equally, if not more so, to administrative proceedings. Ohio Bell Telephone Company v. Public Utilities Com'n., 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937); N.L.R.B. v. Phelps, supra, Jaffe and Nathanson, Administrative Law, 3rd Ed. (1968), 955 et seq.

 Plaintiffs argue that the defendant board members should not be allowed to participate in the determination of whether they have engaged in unprofessional conduct, because the defendants would tend to benefit from a determination that they have engaged in such conduct. It has been stipulated that although the Governor may appoint any optometrist practicing in Georgia to the board, in the past he has always appointed board members after receiving recommendations from the GOA, the representative of the dispensing optometrists. In addition, every current incumbent member of the board is a member of the GOA. Further, it is obvious that if plaintiffs were prevented from practicing optometry in Georgia, their patients would have to seek optometric services from others. Concededly, some of these patients would turn to nonmembers of the GOA for optometric services. Some would probably go to ophthalmologists. Possibly some, who live near the borders of the state, might go outside the state. But it cannot be disputed that some would turn to the defendants and their fellow members of the GOA. Although it is impossible to determine in advance exactly what the benefit to the GOA would be if the licenses of all the plaintiffs were revoked, we think it impossible to characterize the benefit, as the defendants have, as "remote and speculative." Plaintiffs have thousands of patients. Those patients would go somewhere, and there is

a substantial likelihood that many of them would go to the defendants with their patronage. In such a situation, we find it inconceivable that the defendants could be called disinterested in the outcome of plaintiffs' license revocation proceedings. Courts have refused to permit significantly less substantial interest in other proceedings. Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); Tumey v. Ohio, *supra.*

Defendants' major argument in support of the proposition that they would not benefit from the revocation of plaintiffs' licenses is geographical. The only two optometrists against whom license revocation proceedings have been begun are in the Atlanta metropolitan area; only one member of the board practices in the Atlanta area, and he has disqualified himself from those two cases. Put quite simply, this is not good enough. The five members of the board are from the cities of Atlanta, Griffin, Rockmart, Tifton and Douglas. If the board's argument regarding geographical location were accepted, the board could challenge the licenses of all the optometrists in the state simply by disqualifying the member from Atlanta in all Atlanta cases; disqualifying the member from Tifton in all Tifton cases, etc. In this way, the board could—and does—argue that it has removed the financial interest in the case geographically, while assuring through this "round-robin" procedure that essentially the same board decided all the cases. In other words, the possibility for "log-rolling" or mutual "back-scratching" is enormous.

A related, but distinct, argument which the defendants believe demonstrates their lack of pecuniary interest in the case, is that only two optometrists have been proceeded against, and the benefit from any business which could be gained from the demise of the two practices would be *de minimus.* It is also on this ground that the board seeks to distinguish this case from *Gibson,* in which license revocation proceedings were threatened against almost half of Alabama's optometrists. However, this distinction fails in light of the board's admission that it "intends to enforce its regulations against all optometrists licensed but by it . . .," and that the "rules under attack here will likely result in the initiation of proceedings against other optometrists unless their manner of practice is altered. . . ."

Defendants seek to distinguish *Gibson* on two other grounds. First, In Georgia, the members of the board are not *required* to be members of the GOA. Second, the board in these cases has stipulated that in these and all similar cases it will utilize the services of an independent hearing examiner.

▬ It is true that in Georgia the selection of board members from the ranks of the GOA is only a practice, while in Alabama the law required board members to be members of the AOA. We find this distinction unpersuasive. It was conceded by the defendants that the Governor of Georgia has always selected the board members after recommendations by the GOA, and that all present board members are GOA members. That this procedure is not required by law cannot compel a different result. These facts remain: Plaintiffs complain that the tribunal to which they are subjected is biased and has an interest in the result of the license revocation proceedings. Every member of the tribunal is a member of a group which opposes the continuation of the plaintiffs' businesses. These facts were also present in *Gibson* and led the court to agree that such a situation could not continue. We see no difference here.

▬ The second attempted distinction has slightly more substance. The board argues that pursuant to the provisions of the Georgia administrative Procedure Act, they have employed an independent hearing examiner to conduct the hearings regarding plaintiffs' licenses. Although the board could ordinarily review any finding of the hearing examiner on its own motion, it has agreed that in all cases involving the plaintiffs it

will not do so, and will instruct the Assistant Attorney General representing the board in the hearings not to do so. In addition, the plaintiffs will have the opportunity, if they are not satisfied with the results of the hearing, to appeal the hearing examiner's findings to the superior court, the fairness of which is not challenged in these proceedings. Thus, the plaintiffs will be tried in the first instance before an impartial hearing examiner, and will have the option of appealing to an impartial court. Cf. Ward v. Village of Monroeville, *supra*.

This argument, while appealing on the surface, fails to comport with the provisions of the Georgia law concerning the relationship between the hearing examiner and the board.

Essentially, what the board has offered to do is to abdicate a function which the law of Georgia requires it to perform. The board has offered to let the decision of the hearing examiner stand, no matter what it is, and to allow Doctors Justice and Jacobs to appeal to the superior court if they desire. That way, the board argues, even if they are biased, plaintiffs will not be harmed. It is true that the board has the authority to appoint an agency representative to hear the evidence in the case. Ga.Code Ann. § 3A–114. However, the agency representative has the authority only to "initially decide the case." Ga.Code Ann. § 3A–118(a). As § 118(a) makes clear, the representative makes only an "initial decision," which becomes the final decision of the agency only if there is no motion for the board to review the initial decision, or an order by the agency to review on its own motion. Furthermore, the section provides, "On review from the initial decision of such representative the agency shall have all the powers it would have in making the initial decision. . . ." Also, § 118(c) provides that "Each agency shall render a final decision in contested cases. . . ." Thus, the law could not be any more clear: the decision of the agency representative is an initial decision only—a final decision of the agency

may not be produced without participation by the board. The board is simply incapable of eliminating itself from the process of decision.

Defendants have suggested that if the case turns on this issue of state law—that is, whether it is legal for the board to abdicate its role in the process—then the case is a proper one for abstention. We can only repeat what we said before on this issue: It is not every issue of state law—even every difficult issue of state law—which requires abstention. Abstention is a special and extraordinary procedure for use only when the situation absolutely demands it. Such is not the case here. We are not sufficiently confused about the law of Georgia to call for the Georgia Supreme Court to throw us a life preserver. The waters are neither too murky nor too choppy for us to make it by ourselves.

The right to due process of law is not merely to have one's case heard by an impartial tribunal "in the first instance." Ward v. Village of Monroeville, *supra*. The process of decision must be impartial in every instance and in every respect. Just as a chain is only a strong as its weakest link, a decision-making process is only as fair as its most biased component. In this case, that component is the board. The role which the board must inevitably play in the process is sufficient to infect the process with substantial unfairness.

## VIII. VALIDITY OF THE RULES

In Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), the Court, through Justice Douglas, thwarted a district court attempt to invalidate on due process grounds on Oklahoma statute regulating the sale of eyeglasses. After pointing out certain possible breaches of logic in the law, Justice Douglas commented:

But the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the

particular legislative measure was a rational way to correct it.

The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident; or out of harmony with a particular school of thought. [citations omitted] 348 U.S. at 487–488, 75 S.Ct. at 464.

The Oklahoma statute also forbade retail establishments to "permit any person purporting to do eye examination or visual care to occupy space in such retail store." As to this rule, Justice Douglas commented:

It seems to us that this regulation is on the same constitutional footing as the denial to corporations of the right to practice dentistry. Semler v. Oregon State Board of Dental Examiners, supra (294 U.S. 608 at 611 [55 S.Ct. 570, at 571, 79 L.Ed. 1086]). It is an attempt to free the profession, to as great an extent as possible, from all taints of commercialism. It certainly might be easy for an optometrist with space in a retail store to be merely a front for the retail establishment. In any case, the opportunity for that nexus may be too great for safety, if the eye doctor is allowed inside the retail store. Moreover, it may be deemed important to effective regulation that the eye doctor be restricted to geographical locations that reduce the temptations of commercialism. Geographical location may be an important consideration in a legislative program which aims to raise the treatment of the human eye to a strictly professional level. We cannot say that the regulation has no rational relation to that objective and therefore is beyond constitutional bounds. 348 U.S. at 491, 75 S.Ct. at 466.

Only recently, the Court reaffirmed this attitude toward economic regulations in North Dakota State Board of Pharmacy v. Snyder's Drug Stores, 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973). Again through Justice Douglas, the Court reiterated its resolve to let the states have significant leeway in their economic regulations. A North Dakota statute required all pharmacies to be owned by a registered pharmacist or a corporation or association, the majority of the stock in which was owned by registered pharmacists actively engaged in the operation of the pharmacy. Citing the *Williamson* case, the Court refused to strike down the statute.

In this case, the board held public hearings and issued a detailed statement explicitly stating its reasons both for the four-hour-per-week rule and the reasonably-identifiable-with-a-retail-establishment rule. Both rules are reasonably related to valid interests of the board in regulating the practice of optometry in Georgia. The board determined that if an optometrist practiced at a certain location less than four hours per week, the display of his name at that location represented a misrepresentation to the public about the nature of the practice. As for the other rule, it is reasonably related to a valid interest of inhibiting commercialism in the practice of optometry, which the State of Georgia has declared to be a learned profession. Pearle Optical of Monroeville v. State Board of Examiners in Optometry, *supra*.

■ As for plaintiffs' equal protection argument, it is not at all clear that ophthalmologists are under no regulations analogous to those imposed on optometrists, cf. Ga.Code Ann., § 84–916, but even if they were not, the legislature could rationally find that its regulatory scheme need not be applied to ophthalmologists. The equal protection clause of the Fourteenth Amendment does not require the state to treat different groups in the same manner. Only unreasonable discriminations are forbidden. Williamson v. Lee Optical, *supra*.

We have examined carefully all of plaintiffs' other allegations and find each of them to be without merit.

Counsel are directed to prepare an appropriate order.