**TELE-TRIP COMPANY, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 9394.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 2, 1964.

Decided Jan. 11, 1965.

Winthrop A. Johns, Washington, D. C. (Reilly & Wells, Washington, D. C., on brief), for petitioner.

Morton Namrow, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Solomon I. Hirsch, Atty., N. L. R. B., on brief), for respondent.

Before HAYNSWORTH, BOREMAN and J. SPENCER BELL, Circuit Judges.

BOREMAN, Circuit Judge:

Tele-Trip Company, Inc., (hereinafter Tele-Trip or the Company) petitions this court under Section 10(f) of the National Labor Relations Act (hereinafter the Act), 29 U.S.C.A. § 160(f), to set aside an order entered by the National Labor Relations Board on March 6, 1964.[1] The Board cross-petitions for enforcement of its order.

1. See 146 N.L.R.B. No. 27.

The examiner and the Board found Tele-Trip guilty of violating Section 8(a)(1) of the Act in interrogating an employee concerning the identity of union leaders, making threats of economic reprisals if employees joined the Union and in granting a unilateral wage increase;

Tele-Trip, a Delaware corporation engaged in selling air travel insurance throughout the United States, has three locations in the Washington, D. C., area, Washington National Airport, Dulles International Airport and City Terminal at 12th and K Streets. Sales are made by machines and by women employees called booth sales representatives. The Company had commenced operating at National in December 1960, at City Terminal in September 1962, and at Dulles in November 1962. At the time of this controversy the Company employed fifteen representatives at National, four at Dulles and three at City Terminal. Although the main office of the Company was in Washington, the three area locations were under the supervision of Sam Irby who maintained his office at National and spent the greater part of his time there; however, he made periodic visits to Dulles and City Terminal. Irby reported to Mr. Cruze, the vice-president in charge of sales, and to Mr. Brady, the president, who had offices in the main office downtown.

The acts which were found to constitute unfair labor practices occurred at Washington National Airport during an organizational drive by the Insurance Workers International Union AFL-CIO. The organization campaign began in mid-February 1963 when Mrs. Petti, a booth sales representative at National, contacted a vice-president of the Union. He gave her union cards and with the help of Mrs. Daniel, another employee at National, she distributed the cards to the other booth sales representatives at National for the purpose of securing their signatures. The union activity was carried on secretly and most of the contacts with the employees were made on the way to and from work; one meeting was held on March 12 at the home of an employee where four persons, including Petti and Daniel, were present. The Company admitted, however, that Brady had heard "rumors" of union ac-

tivity on March 22 when Casteel, a company employee at Dulles who was found by the examiner and the Board to be a "supervisor," came to the main office to deliver some policies and while there inquired of Brady concerning the union rumors at National. Brady stated that this type of talk was not unusual and he regarded it as merely a "rumor." The organization drive reached its peak on March 27 when the vice-president of the Union mailed a letter to Irby stating that the Union had been selected as bargaining agent for the booth sales representatives at National and requesting recognition of the Union for collective bargaining purposes.

On the same day the letter was mailed to Irby, Brady, the company president, called Irby and asked him to meet Brady and Cruze for lunch at a Washington club to discuss "lagging sales" at National. Brady and Cruze testified that on March 26 they had received the semimonthly sales report for March 1–15 which showed sales were behind those of the preceding year. As air traffic had been increasing they became alarmed and decided something must be done. At the meeting which lasted approximately two and one-half hours, the situation and possible remedies were discussed, according to their testimony, All three officers agreed that the only thing which could be done was to discharge the employees with low sales production and replace them with new girls. Irby stated he could only dismiss two girls at that time and still operate all the sales booths, but he thought Petti, Jenkins and Daniel were the lowest. Irby did not have with him the records of individual sales and Brady and Cruze left it to him to decide which two employees to terminate. Irby also suggested that a pay raise might serve as an incentive as many of the employees had been at the maximum hourly rate of $2.00 for some time. The officers admitted that the union "rumors" were

also guilty of violating 8(a) (3) by discharging two employees for their union activities. Exceptions to the examiner's

report filed by the Company were overruled and the findings and conclusions of the examiner were adopted by the Board.

discussed, but insistently denied that names of particular employees were mentioned.

After the luncheon Brady and Cruze returned to the main office and decided that a pay raise as suggested by Irby might help the situation. Brady composed a letter which he sent to twelve employees. Eight employees at National and one at City Terminal were increased from $2.00 to $2.10 per hour, three employees who had been with the Company six months were raised from their starting salary of $1.75 to $2.00 an hour (all at National), and Irby's salary was increased $35.00 per month. It was testified that it was a Company policy to grant automatic increases from $1.75 to $2.00 to all employees after they had been with the Company for six months.

According to Irby, he returned to his office at National and compiled tables showing the sales averages for all the booth sales representatives at National which confirmed his statement to Brady that Petti, Jenkins and Daniel were the low producers. As the standing of Jenkins and Daniel was relatively close, he decided to retain Jenkins and put her on probation as she had five children but to discharge Petti and Daniel (Irby explained further that he felt Jenkins was putting forth more effort than Daniel). It was then too late in the day to take any action as Petti, Jenkins and Daniel had gone home. The next morning, March 28, when Irby came to work he telephoned Petti at her sales booth and Daniel at home (as she had the day off) and told them to report to his office. Petti arrived and he dismissed her stating that it was because of her low sales average. After Petti left, Daniel arrived and he told her the same thing. Neither girl at that time mentioned the Union. Irby also sent a note to the payroll department which stated the girls were dismissed because of continued low level sales. In the afternoon he gave Jenkins a letter which stated she had been placed on probation and further action would be taken unless her sales improved.[2]

After these occurrences the Union continued its organizational drive. On March 29 it filed a petition with the Regional Office of the Board requesting a representation election. On April 22 a hearing was held on the petition at which Tele-Trip asserted that National alone was not an appropriate bargaining unit and contended that the unit should include all three Washington locations. Then, on April 30, the complaint was filed with the Board which led to the Board's now contested order. A hearing was held on August 26 and 27 before a trial examiner and he filed his report and recommended order on October 28.

Throughout the proceedings Tele-Trip has contended: That the Company was not responsible for Casteel's conduct as she was not a supervisor within the meaning of Section 2(11) of the Act, 29 U.S.C.A. § 152(11),[3] as she had only routine responsibility; that the dismissal of Petti and Daniel and the wage increases were steps taken to combat "lagging sales" at National and could not have been for any other reason as the union activities were carried on in secrecy and the officers were unaware of the organizational drive until they received the letter on March 28 which was the day after the action was taken. To justify the dismissals the Company also introduced the tables Irby had compiled which showed the sales averages

---

2. Jenkins testified at the hearing that when she received the letter Irby told her to pay no attention to it and she would soon be getting a wage increase.

3. Section 2(11) defines the term "supervisor" as:
"any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

for the employees at National. The Company contends here that the findings and conclusions of the trial examiner which were adopted by the Board were not supported by substantial evidence in the record and that the trial examiner was biased and exhibited his determination to reach a clearly preconceived result.

The finding by the trial examiner that the Company had violated Section 8(a) (1) of the Act by interrogating an employee and making threats of economic reprisal focuses upon Casteel, the "supervisor" at Dulles, and her activities. The acts which have been found to constitute this unfair labor practice took place on the evening of March 22, the same day Casteel had gone to the main office and told Brady of the union "rumors." Jenkins testified that she had been called by Casteel who asked her to give Casteel the name of a third party involved in the union movement. When Jenkins stated she did not have that information, Casteel told her if the girls joined a union wages would be lowered and certain privileges withdrawn. Casteel admitted she had called National that evening not for the purpose of talking to Jenkins, but that Jenkins happened to answer the telephone and they conversed. She stated that the Union was discussed but that she could not recall the exact conversation.

In this connection the real issue centers on whether or not Casteel was a "supervisor" within the meaning of Section 2(11) of the Act. Casteel had been employed as a booth sales representative at National when the Company opened that office in December 1960. When the Company opened the Dulles office Irby asked her if she would transfer there. Her primary responsibility would be to report directly to Irby on the conduct of the other employees and perform certain administrative functions. In addition, she was to be a booth sales representative and sell insurance just like the other employees. The Company operated two sales booths at Dulles with four employees, including Casteel, who worked different shifts. When Casteel was not there the other employees took care of themselves. Casteel, like the other representatives, worked forty hours per week; however, eighty per cent of her time was spent selling insurance and the other twenty per cent was spent doing administrative work. Casteel's salary was computed in the same manner as the other employees. Each received a base rate plus commissions on gross sales. Casteel's monthly pay was $20.00 to $30.00 more than the other employees at Dulles. This difference was explained because of a $10.-00 travel allowance and the fact that she was making $2.00 per hour while the other girls were making $1.75 as they had been with the Company less than six months.

Casteel's administrative work consisted of interviewing job applicants and handling cash collected from policy sales. According to Casteel, the job openings at Dulles had been few but when applicants came in she always permitted them to fill out application forms which she filed for later reference and informed the applicants that when there was an opening she would let them know. Irby stated that Casteel did recommend to him the girls she considered the best prospects but that he always interviewed the girls himself before he hired them. Casteel stated that her handling of cash was a simple routine matter. Each day each representative put in an envelope, which she placed in a safe, a report showing the number of policy sales together with the money collected. Casteel was responsible for removing the cash from the envelopes, checking the calculations and depositing the money at a bank. The deposit tickets along with the policies were mailed to the main office.

Relevant to the finding that Casteel was a supervisor within the meaning of the Act was the testimony of a former employee at Dulles, Mrs. Rust, who had been discharged for disciplinary reasons. Rust testified generally that Casteel made work assignments for the employees, interviewed and rejected job applicants,

placed employees on probation and criticized their work. Concerning herself, she stated that Casteel had placed her on probation and later discharged her. On cross-examination, however, she admitted that Casteel always took job applicants to her office; that she, Rust, did not know what happened there; that she could not give the name of a rejected applicant and that she did not know what business conversations Casteel and Irby had on the telephone or what Irby's instructions to Casteel may have been. Irby and Casteel both testified that Casteel had no authority to hire, fire, or discipline any employee and that this power rested in Irby alone. Irby stated that he made out the work schedules and gave them to Casteel. Both testified that when Rust was placed on probation Casteel called Irby and it was he who made the decision; the same procedure was followed when Rust was dismissed. This in sum was the testimony before the trial examiner on this point.

■ Considering the evidence as a whole with respect to Casteel, we think it insufficient to support the finding that she was a supervisor within the meaning of and as defined in Section 2(11) of the Act. The testimony and evidence were overwhelmingly persuasive that Casteel performed certain routine tasks other than selling insurance policies but that they did not require the use of independent judgment; that she did make reports to Irby and to the main office but she was not vested with the authority to do more than carry out the instructions received from her superiors. Mrs. Rust's testimony was so weakened and discredited on cross-examination as to have no probative value. Therefore, we conclude that the finding of a violation of Section 8(a) (1) based on the activities of Casteel in the capacity of a "supervisor" cannot be sustained.

The other major issue arises from the facts and circumstances surrounding the dismissal of Petti and Daniel and the unilateral wage increases. The Company contends that, other than the fact that the discharges and wage increases oc-curred on the day the Union mailed a letter to the Company requesting union recognition and the fact that company action was taken in rather rapid fashion, there was nothing to indicate the acts of the officers were motivated by a desire to crush the union drive as the union activity had been secret and the officers did not know any particular person associated with the movement. To prove the officers knew about Petti and Daniel the Union relied upon the testimony of Jenkins. She stated that on the same evening, March 22, when Casteel called her and interrogated her about the Union leaders, Casteel told her that she had been to the main office that day and informed Brady about Petti and Daniel. Casteel in her testimony could not recall certain parts of the telephone conversation but she did testify positively that during the conversation the Union was discussed although she had not mentioned Petti and Daniel and she had not told Mr. Brady or anyone else in the main office about Petti and Daniel as she had heard only that several girls were involved. Brady and Cruze also testified that when Casteel was in the office on March 22 she mentioned the union rumors but did not mention any particular individual. It is the Company's argument that the flat contradiction by Brady, Cruze and Casteel of Jenkins' testimony was bolstered by certain other events which tended to cast doubt upon the truth of Jenkins' statements. Jenkins had stated that after Casteel quit talking to her, she called Petti and told Petti that the main office knew about her and Daniel and they had better watch out. Yet, Petti never called Daniel about this incident, she did not report it to the union vice-president although she talked to him frequently, she did not comment to Irby, when he dismissed her, concerning the possibility that she was being discharged for her union efforts, and she did not mention the conversation with Jenkins in her testimony. Jenkins also failed to mention this disputed part of the telephone conversation in a written statement which she gave to the General Counsel on June 3.

Irby undertook to explain his haste in discharging the two employees by stating that when he decided to terminate an employee he did so immediately. However, the Company had laid off eight employees in February 1962 and at that time had given two weeks' notice. The officers explained that the two situations were entirely different; that the 1962 layoff was necessary because the Company was overstaffed and those released were not to be replaced; consequently, to determine who were the best sales producers the Company ran a test period for two weeks. As to the present situation, they stated that the Company knew the records of the employees and it was decided that those who were the low producers should be replaced with more competent personnel.

To justify the dismissals, as earlier stated, the Company introduced charts or tables compiled by Irby which showed the individual sales averages. According to Irby and Cruze, these tables were based upon the sales of two types of policies which constituted ninety-five per cent of the Company's business. The first chart was based on sales of "T-16 AV" policies covering the period from January 1 to March 15, 1963, and showed Petti last, then Jenkins, Daniel and Cunningham in that order. The second chart, covering the same period, was based on sales of "T-18" (short term) policies. It showed Petti last, then Jenkins, Cook and Daniel in that order. Petti and Daniel testified that, according to the last chart of sales which they had seen posted on the bulletin board sometime in February, Jenkins and one Fellmer were below them in sales. Later a chart was produced by Irby showing sales for the last half of February which appeared to substantiate the testimony of Petti and Daniel at least as to the sales of the T-18 policies for that period. The record discloses a rather extended discussion, in which the examiner participated, concerning the preparation of the charts, the periods covered thereby, the method or system employed in determining comparative sales. It was ob-

vious that the examiner did not find the charts particularly convincing and he argued that the use of other methods covering other time periods might more accurately reflect the comparative records of the most profitable sales, but the company witnesses insisted that the methods and periods used were more accurate, were particularly appropriate to that type of business and provided more reliable information. No effort appears to have been made by either side to experiment with any other method to either confirm or cast doubt upon the reliability of the charts as proof of comparative sales.

The evidence was full of conflict on material issues. The crediting of certain witnesses in the light of surrounding facts and circumstances would clearly support certain inferences, findings and conclusions while the crediting of other witnesses and minimizing the importance or pertinency of surrounding circumstances would clearly support contrary inferences, findings and conclusions. There was evidence that officers of the Company had knowledge of union activity several days before critical happenings and developments such as the demand for union recognition, the policy meeting, the hurried notification of employees of a wage increase, the precipitate decision to discharge the two employees with the worst performance records and to replace them with untried and inexperienced sales girls. The explanation of the discharge of Daniel instead of Jenkins was that Jenkins had five children and appeared to be putting forth more effort although Jenkins' record was shown to be slightly lower than that of Daniel. Perhaps it was pure coincidence that Petti and Daniel were shown by the evidence to have distributed union membership cards and to have attended a meeting where union organization was first being seriously considered shortly before "rumors" of union activity began to reach the ears of management. Perhaps it was mere coincidence that, at the very moment a written demand for union recognition was on its

way, management became alarmed concerning declining sales, held a policy meeting, hastily gave notice of an unsolicited wage increase and decided to forthwith discharge two employees at National, the focal point of union organization.

■ Upon our review and consideration of the whole record, we cannot say that the findings of unfair labor practices on the part of the Company (except the finding based upon the conduct of Casteel as a "supervisor") are not supported by substantial evidence. Therefore, the Board's order should be enforced, consistent with this opinion, and it will be so ordered.

Complaint is made that the Company was denied a fair hearing because of the conduct of the examiner. While we do not reach the conclusion that enforcement of the Board's order must be here denied on this ground, we feel that the manner in which the examiner conducted the hearing calls for critical comment.

During the course of the hearing the examiner persistently interrupted the examination of witnesses, not only the witnesses offered by the Company but also those called by the General Counsel. While Irby was attempting to give his testimony the examiner interrupted approximately sixty times to ask questions. The record is replete with instances where the examiner stopped counsel in examination of witnesses, assumed the responsibility of taking over the interrogation in argumentative fashion; on occasions he displayed a critical approach, obvious disbelief and, in a few instances, what appears to be an attitude closely bordering on partisanship or even hostility. To say the least, there was every indication of unwarranted interference with the systematic and orderly presentation of evidence since there was no indicium of ineptness or incompetency of counsel or their inability to properly develop the issues.

Under such circumstances the temptation is strong to accept the Company's invitation to order a new hearing before another examiner. Such action might be well calculated to have a salutary effect and convey a timely warning that in this circuit this court will brook no display of partisanship, hostility, advocacy, bias or prejudice on the part of trial examiners in administrative proceedings.

■ Let there be no misunderstanding of these comments. Certainly a trial examiner is free to and should interrupt witnesses on occasions when necessary to a clarification of the testimony. But he must be impartial and must not attempt to establish proof to support the position of any party to the controversy; once he does so he becomes an advocate or a participant, thus ceasing to function as an impartial trier of fact, and a hearing so conducted is lacking in the fundamental fairness required by due process. In the first instance it is the duty and obligation of the administrative agency or board receiving a trial examiner's report and recommendation to carefully scrutinize the record for any indication of bias, prejudice or partiality on the part of the examiner and if such is evident a rehearing should be ordered. We shall expect no less.

Enforcement granted in part and denied in part.