[Civ. No. 15971. Third Dist. May 23, 1977.]

AMERICAN MOTORS SALES CORPORATION,
Plaintiff and Respondent, v.
NEW MOTOR VEHICLE BOARD OF THE STATE OF
CALIFORNIA, Defendant and Appellant;
KEN COLLINS, Real Party in Interest and Respondent.

COUNSEL

Evelle J. Younger, Attorney General, Robert L. Mukai and Edna R. Walz, Deputy Attorneys General, for Defendant and Appellant.

Crow, Lytle & Gilwee and James McCall as Amicus Curiae on behalf of Defendant and Appellant.

O'Melveny & Myers, Allyn O. Kreps, Donald M. Wessling and Joseph M. Malkin for Plaintiff and Respondent.

No appearance for Real Party in Interest.

OPINION

PARAS, J.—On April 24, 1974, American Motors Sales Corporation (hereinafter American Motors) notified its South Lake Tahoe dealer, Ken Collins, that it would terminate his Jeep franchise in 90 days for "failure to develop a sufficient sales volume . . . ." On July 26, 1974, Collins filed a protest with the New Motor Vehicle Board of the State of California (hereinafter Board) under Vehicle Code section 3060.[1]

A hearing was held under section 3066, and the hearing officer's proposed decision found good cause for termination, (§ 3060, subd. (b)). But the Board rejected the proposed decision, took additional testimony from the zone manager of American Motors and from Collins, and concluded that the termination was without good cause. American Motors then successfully sought a writ of mandate from the superior court. The trial judge ruled that sections 3060 and 3066 are violative of due process of law under article I, section 7 of the California Constitution and section 1 of the Fourteenth Amendment to the United States Constitution, "because four of the nine members of the Board are, by statute, (Vehicle Code § 3001), new car dealers, who may reasonably be expected to be antagonistic to franchisors such as American Motors."

The Board appeals, and is supported in this court by the Northern California Motor Car Dealers Association and the Motor Car Dealers Association of Southern California, amici curiae.

---

[1]Unless otherwise noted, all section references are to the California Vehicle Code.

## I

There is a long history of legal warfare between the automobile manufacturers and their dealers, ranging from the "military discipline" of the Ford Motor Company in the 1920's to litigation under the 1956 federal Dealers Day in Court Act, (15 U.S.C. §§ 1221-1225).[2] The act provides in part that "An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States . . . and shall recover . . . damages . . . by reason of the failure of said automobile manufacturer . . . to act in *good faith* . . . in terminating, cancelling, or not renewing the franchise with said dealer." (15 U.S.C. § 1222.) (Italics added.) The act does not however preempt state laws (15 U.S.C. § 1225).

The Board (originally called the New Car Dealers Policy and Appeals Board) was established in 1967 to hear appeals of new car dealers regarding licensing by the Department of Motor Vehicles. (§§ 3000, 3050.) Its duties at that time[3] were substantially the same as those of many other state occupational licensing boards; and as with other boards,[4] the Legislature mandated that certain of the Board members (four of the nine) be new car dealers (§ 3001). In 1973, the Legislature renamed the Board the "New Motor Vehicle Board," and added sections 3060 to 3069 which became operative July 1, 1974. These statutes established a series of procedures for the adjudication of disputes between two distinct classes of litigants, new car dealers and new car manufacturers. They empower the Board to resolve controversies relating to: (1) whether there is "good cause" to terminate or to refuse to continue a franchise (§ 3060); (2) whether there is "good cause" not to establish or relocate a motor vehicle dealership in a "relevant market

---

[2] An excellent review of this history, from both a legal and sociological perspective, is in Macaulay and Stewart, Law and the Balance of Power: The Automobile Manufacturers and their Dealers (New York: Russell Sage Foundation, 1966).

[3] Originally the Board's functions were:
1. To prescribe rules and regulations relating to the licensing of new car dealers;
2. To hear and consider, within certain limitations, an appeal by an applicant for or the holder of a license as a new car dealer from an action or decision by the Department of Motor Vehicles; and
3. To consider any other matter concerning the activities or practices of applicants for or holders of licenses as new car dealers. (§ 3050.)

[4] In its opening brief the Board lists 21 instances of other occupational licensing boards a majority of whose members must be licensees. Examples are the Board of Governors of the State Bar (15 of 21, Bus. & Prof. Code, §§ 6013, 6013.5), State Board of Cosmetology (3 of 5, Bus. & Prof. Code, § 7301), State Board of Accountancy (6 of 8, Bus. & Prof. Code, § 5000), and Board of Dental Examiners (7 of 8, Bus. & Prof. Code, § 1601).

area" (§ 3062); (3) delivery and preparation obligations (§ 3064); and (4) warranty reimbursement (§ 3065).

 The result is that although under the 1973 legislation the adversaries before the Board invariably derive from two distinct groups, dealers and manufacturers, the Board which resolves their disputes *must* include four members from the dealer group but *need not* include any members from the manufacturer group. Does an administrative tribunal so constituted meet the requirements of due process? Is it such "a competent *and impartial* tribunal in administrative hearings" (*Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163]) as to comport with due process? We agree with the trial judge's negative answer to these questions.

## II

The conclusion is unavoidable that dealer-members of the Board have an economic stake in every franchise termination case that comes before them. The ability of manufacturers to terminate any dealership, including that of a Board member, depends entirely upon the Board's interpretation of "good cause." It is to every dealer's advantage not to permit termination for low sales performance, which fact however is to every manufacturer's disadvantage. As Professor Macauley puts it: "For example, a Ford dealer might be able to make a hundred dollar profit on the sale of one car or a ten dollar profit on each sale of ten cars. The immediate result of either strategy is the same for the dealer, but clearly the impact on the Ford Motor Company differs greatly, because in one case it sells only one car while in the other it sells ten. And even if our hypothetical Ford dealer sells ten cars at only a ten dollar profit on each one, he has no reason to care whether he sells Mustang sport cars, Falcon station wagons, or Thunderbirds. Yet the Ford Motor Company does. It must sell many units of all of the various models it makes, and it must sell its less popular models to recover its tooling costs on them."[5]

Amici curiae respond to this financial interest by pointing to instances in which a dealership-board-member may be more financially interested in ruling in favor of the manufacturer; this would occur, for example, where the franchise of a dealer-member's direct competitor is being terminated, or where the member may wish to ingratiate himself with his own manufacturer. We do not view this as fairness, but rather as an equalizing unfairness. Either way, the objectionable feature of dealer-

---

[5]Macaulay and Stewart, Law and the Balance of Power: The Automobile Manufacturers and their Dealers, *supra* page 8.

membership on the Board is the distinct possibility that a dealer-manufacturer controversy will not be decided on its merits but on the potential pecuniary interest of the dealer-members.

The landmark case on due process limitations upon such pecuniary conflicts of interest is *Tumey* v. *Ohio* (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243]. There a mayor-judge, in addition to his regular salary, was paid a certain sum per case in liquor law violation cases in which he found the defendant guilty. The United States Supreme Court found this a denial of due process, saying: "The mayor received for his fees and costs in the present case $12, and from such costs under the prohibition act for seven months he made about $100 a month, in addition to his salary. We can not regard the prospect of receipt or loss of such an emolument in each case as a minute, remote, trifling or insignificant interest. It is certainly not fair to each defendant brought before the mayor for the careful and judicial consideration of his guilt or innocence that the prospect of such a prospective loss by the mayor should weigh against his acquittal.

". . . There are doubtless mayors who would not allow such a consideration as $12 costs in each case to affect their judgment in it, but the requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice. *Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused denies the latter due process of law.*" (Italics added.) (273 U.S. at pp. 531-532 [71 L.Ed. at p. 758].)

The *Tumey* doctrine has been extended recently. In *Ward* v. *Village of Monroeville* (1972) 409 U.S. 57 [34 L.Ed.2d 267, 93 S.Ct. 80], the mayor-judge had no direct pecuniary interest in convicting the accused, but the fines he levied constituted somewhere between 40 and 50 percent of the village revenues. Again finding a violation of due process, the Supreme Court stated (409 U.S. at p. 60 [34 L.Ed.2d at p. 270]) that the mayor-judge's interest as chief executive officer of the village, responsible to account for village finances to the council, presented a "possible temptation" by which "the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribu-

tion from the mayor's court."[6] (See also *People* v. *Superior Court (Greer)* (1977) 19 Cal.3d 255, 266 [137 Cal.Rptr. 476, 561 P.2d 1164].)

While the foregoing cases involved due process in a criminal law context, *Gibson* v. *Berryhill* (1973) 411 U.S. 564 [36 L.Ed.2d 488, 93 S.Ct. 1689], is more directly in point. The issue there was whether the Alabama Board of Optometry was a fair tribunal to determine that it did or did not constitute "unprofessional conduct" for an optometrist to practice in Alabama as a salaried employee of a business corporation. The board of optometry consisted exclusively of privately practicing optometrists and included none who were either salaried or employed by business corporations. Only privately practicing optometrists were eligible to become members of the Alabama Optometric Association, and by statute only such members could sit on the board of optometry. The association filed charges of unprofessional conduct with the board of optometry against nine optometrists who were employed on a salaried basis by Lee Optical Co., a business corporation. Upon the lodging of the charges, the board of optometry deferred hearing thereon and filed its own lawsuit in an Alabama state court against Lee Optical Co. and its optometrist-employees, charging them with "unlawful practice of optometry." After prevailing in the trial court, the board of optometry then undertook to hear and decide the association's charges. Lee Optical Co.'s optometrists then sued in federal district court under the Civil Rights Act of 1871 (42 U.S.C. § 1983) and obtained an injunction.

Affirming the district court's decision, the Supreme Court ruled that the board of optometry was not a fair tribunal for the determination of the "unprofessional conduct" charges. It stated: "First [the district court determined that], the Board had filed a complaint in state court alleging that appellees had aided and abetted Lee Optical Co. in the unlawful practice of optometry and also that they had engaged in other forms of 'unprofessional conduct' which, if proved, would justify revocation of their licenses. These charges were substantially similar to those pending against appellees before the Board and concerning which the Board had noticed hearings following its successful prosecution of Lee Optical in the state trial court.

"Secondly, the District Court determined that the aim of the Board was to revoke the licenses of all optometrists in the State who were employed by business corporations such as Lee Optical, and that these optometrists accounted for nearly half of all the optometrists practicing

---

[6]See Note *The "Right" to a Neutral and Competent Judge in Ohio's Mayor's Courts* (1975) 36 Ohio St.L.J. 889.

in Alabama. Because the Board of Optometry was composed solely of optometrists in private practice for their own account, the District Court concluded that success in the Board's efforts.would possibly redound to the personal benefit of members of the Board, sufficiently so that in the opinion of the District Court the Board was constitutionally disqualified from hearing the charges filed against the appellees." (411 U.S. at p. 578 [36 L.Ed.2d at pp. 499-500].)

". . . Arguably, the District Court was right on both scores, but we need reach, and *we affirm, only on the latter ground of possible personal interest.*

"It is sufficiently clear from our cases that *those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes. Tumey* v. *Ohio,* 273 U.S. 510 (1927). And *Ward* v. *Village of Monroeville,* 409 U.S. 57 (1972), indicates that the financial stake need not be as direct or positive as it appeared to be in Tumey. It has also come to be the prevailing view that '[m]ost of the law concerning disqualification because of interest applies with equal force to . . . administrative adjudicators.' K. Davis, Administrative Law Text § 12.04, p. 250 (1972), and cases cited." (Italics added.) (411 U.S. at pp. 578-579 [36 L.Ed.2d at pp. 499-500].)

In *Withrow* v. *Larkin* (1975) 421 U.S. 35, 47 [43 L.Ed.2d 712, 723, 95 S.Ct. 1456], the United States Supreme Court additionally notes: "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.' " (See also *In re Murchison* (1955) 349 U.S. 133, 136 [99 L.Ed. 942, 946, 75 S.Ct. 623].)

The Board erroneously equates the issue before us with that involved in cases which hold that a licensing or regulatory agency may constitutionally be composed in whole or in part of members of the business or profession regulated. (*Ex Parte McManus* (1907) 151 Cal. 331 [90 P. 702]; *Rite Aid Corp.* v. *Bd. of Pharmacy of the State of N. J.* (D.N.J. 1976) 421 F.Supp. 1161; *Hortonville Dist.* v. *Hortonville Ed. Assn.* (1976) 426 U.S. 482 [49 L.Ed.2d 1, 96 S.Ct. 2308].) We have no quarrel with such holdings. Indeed who can better judge the qualifications to practice of a doctor of medicine (as one example), or his adherence to ethical standards of the medical profession, than other doctors of medicine? Whatever incidental economic benefit doctors may gain by disciplining other doctors is not of constitutional proportion; their training, technical knowledge, and exper-

ience give them the necessary expertise to make such judgments, while prima facie these are lacking in lay persons.

Accordingly, given its functions prior to the 1973 legislation, the Board was legally constituted. But as noted, matters were then substantially altered. No longer did the Board solely sit in judgment upon new car dealers in such matters as eligibility and qualification for a license, regulation of practices, discipline for rule violations, and the like. It was given the added power to intrude upon the contractual rights and obligations of dealers and their product suppliers, entities whose respective economic interests are in no way identical or coextensive, frequently not even harmonious. No longer did members of a trade or occupation (dealer-Board-members) regulate only their own kind; they began to regulate the economic and contractual relations of others with their own kind. The considerations which support and dictate the rule of *Ex Parte McManus* no longer prevail, for car dealers have no unique or peculiar expertise appropriate to the regulation of business affairs of car manufacturers.

Despite this reality, the Legislature retained the requirement that the nine-man Board consist of at least four car dealers. In effect it took sides in all Board-adjudicated controversies between dealers and manufacturers, making certain that the dealer interests would at all times be substantially represented and favored on the adjudicating body. This legislative partisanship damns the Board. ■ The state may not establish an adjudicatory tribunal so constituted as to slant its judicial attitude in favor of one class of litigants over another. ■ By doing so in this instance, the Legislature violated its obligation to assure evenhandedness in the adjudicatory process.

The *Tumey, Ward,* and *Berryhill* cases above cited differ from the present case in one substantial particular. There the entire adjudicatory body (a single judge in *Tumey* and *Ward* and all the board members in *Berryhill*) was infected by pecuniary interest, while here a minority of the full Board is so infected. Thus we do not read those cases as authority for a rule that every multiple-person administrative agency or board *ipse dixit* runs afoul of due process whenever one or more of its members is possessed of the condemned pecuniary interest. Nonetheless they serve as a springboard for our holding that in the context of this case there has been a denial of due process of law.

The Board argues that antagonism or bias of a judge toward a class (rather than toward an individual litigant) is not constitutionally

disqualifying (*N.L.R.B.* v. *Dennison Manufacturing Company* (1st Cir. 1969) 419 F.2d 1080, 1085; *Tele-Trip Company* v. *N.L.R.B.* (4th Cir. 1965) 340 F.2d 575, 581), and that a disqualifying bias may not be inferred from the mere circumstance of the adjudicator's private life, i.e., "the bare circumstance that four Board members are new car dealers." (*Parker Precision Products Co.* v. *Metropolitan Life Ins. Co.* (3d Cir. 1969) 407 F.2d 1070, 1077-1078; *Commonwealth of Pa.* v. *Local U. 542, Int. U. Of Op. Eng.* (E.D.Pa. 1974) 388 F.Supp. 155, 159; *Central Sav. Bank of Oakland* v. *Lake* (1927) 201 Cal. 438 [257 P. 521]; *McKay* v. *Superior Court* (1950) 98 Cal.App.2d 770 [220 P.2d 945].) As we elsewhere more specifically point out however, we do not rest our holding upon simple status. Because the challenged Board members have a "substantial pecuniary interest" in franchise termination cases (cf. *Gibson* v. *Berryhill, supra*), their *mandated* presence on the Board potentially prevented a fair and unbiased examination of the issues before it in this case, in violation of due process.[7]

For any who might yet have difficulty comprehending the reason why the guaranteed minimum of four car dealers on the Board is both unfair and unconstitutional, the American Motors' brief offers one final telling argument. If the Legislature in 1973 had deleted the requirement that car dealers sit on the Board and had made it mandatory that four officers of car manufacturer corporations sit thereon, would the car dealers have found this acceptable? Of course not.

In summary, we do not hold, as might be argued by the Board, that car dealers are biased solely because they are members of the dealer-class of litigants and are thus per se constitutionally ineligible to sit on the Board. What we hold is that the combination of (1) the mandated dealer-Board members, (2) the lack of any counterbalance in mandated manufacturer members, (3) the nature of the adversaries in all cases (dealers v. manufacturers), and (4) the nature of the controversy in all cases (dispute between dealer and manufacturer) deprives a manufacturer-litigant of procedural due process, because the state does not furnish an impartial tribunal.

---

[7] A seemingly contrary holding in *Ford Motor Company* v. *Pace* (1960) 206 Tenn. 559 [335 S.W.2d 360], appeal dismissed (1960) 364 U.S. 444 [5 L.Ed.2d 192, 81 S.Ct. 235] rehearing denied (1961) 364 U.S. 939 [5 L.Ed.2d 371, 81 S.Ct. 377], does not impress us. The Tennessee court did not address the specific issue directly but disposed of it under the doctrine that generally a licensing and regulatory agency may constitutionally be composed of members of the business or profession regulated. (335 S.W.2d at p. 367; cf. *Ex Parte McManus* (1907) 151 Cal. 331 [90 P. 702].) We do not find it persuasive.

## III

We next consider what is in effect a harmless error argument. Because a majority of the Board (the five remaining members) is composed of disinterested persons, amici curiae argue that the Board as a whole must be considered impartial, citing a number of cases dealing with delegation of legislative power *to fix prices and make rules.* (*State Board* v. *Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436 [254 P.2d 29]; *Allen* v. *California Board of Barber Examiners* (1972) 25 Cal.App.3d 1014 [102 Cal.Rptr. 368, 54 A.L.R.3d 910]; *Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1 [97 Cal.Rptr. 431].) Since we are not concerned with the right to an impartial lawmaker but with an undisputed right to an impartial adjudicator, the cases cited do not apply.

The argument in any case has no merit. We reiterate that a new car dealer as such is not per se biased to a degree that he cannot or should not under any circumstances serve on the Board. ■ Simple presence of a biased member does not deprive a board of jurisdiction in a particular case. (*Winning* v. *Board of Dental Examiners* (1931) 114 Cal.App. 658 [300 P. 866]; *Dyment* v. *Board of Medical Examiners* (1928) 93 Cal.App. 65 [268 P. 1073]; *Butler* v. *Scholefield* (1921) 54 Cal.App. 217 [201 P. 625].) The evil here lies in the state's insistence that under all circumstances the adjudicatory deck of cards be stacked in favor of car dealers. That evil is not eliminated by stacking the deck four-ninths of the way rather than all the way.

Insofar as the Board is given the power to adjudicate disputes between dealers and manufacturers, it is invalidly constituted. Its decision herein is a nullity because reached in violation of due process.

The judgment is affirmed.

Friedman, Acting P. J., concurred.

REGAN, J.—I dissent. In the proceeding in mandate the trial court ruled sections 3060 and 3066 of the Vehicle Code are violative of due process

of law "because four of the nine members of the Board are, by statute, ... new car dealers, who may reasonably be expected to be antagonistic to franchisors such as American Motors." The majority, in sustaining the trial court, asserts "the objectionable feature of dealer-membership on the Board is the distinct possibility that a dealer-manufacturer controversy will not be decided on its merits but on the potential pecuniary interest of the dealer-members." Further, the majority states: "The state may not establish an adjudicatory tribunal so constituted as to slant its judicial attitude in favor of one class of litigants over another." Following this observation to its logical conclusion the presence on the board of one dealer would be violative of due process of law. This conclusion is flawed in a number of respects. It is sheer speculation to conclude, absent a finding of actual bias, that a dealer-member has a pecuniary interest antagonistic to the manufacturer in disputes between dealer and manufacturer. It is more reasonable to conclude that a dealer-member would "slant its judicial attitude" against a competitive dealer.

I am in agreement with the holding in *Rite Aid Corp.* v. *Bd. of Pharmacy of State of N.J.* (D.N.J. 1976) 421 F.Supp. 1161. There a pharmacy chain store system sought to declare unconstitutional and to enjoin the enforcement of certain New Jersey statutes regulating the practice of pharmacy. The pertinent state law provides memberships in the board of pharmacy shall consist of five members who shall be registered pharmacists actually engaged in conducting a pharmacy and who shall continue in the practice of pharmacy during the term of his office.

Rite Aid contended the statute facially unconstitutional because it requires that pharmacists regulate their business competitors and is unconstitutional as applied to Rite Aid and chain stores in general as independent pharmacists are required to regulate chain store pharmacies. (The court found Rite Aid's constitutional claims to be without merit.)

Thus, argued Rite Aid, the board members are necessarily biased and can neither be impartial in their regulatory functions nor in adjudicating alleged violations of the pharmacy act by Rite Aid and other non Board-member pharmacists.

The court took notice of *Tumey* v. *Ohio* (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243], relied upon by the majority here as a

"landmark case on due process limitations upon such pecuniary conflicts of interest," and noted in *Rite Aid, supra,* 421 F.Supp. pages 1169-1170:

"It is fundamental that one accused of violating the law is entitled to a fair trial in a fair tribunal. *Tumey* v. *Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). In achieving that standard we have sought to prevent not only actual bias, but also the appearance of bias. *In re Murchison, supra* at 136, 75 S.Ct. 623. To this end, the Supreme Court has stated that 'every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the state and the accused, deprives the latter due process of law.' *Tumey* v. *Ohio, supra,* 273 U.S. at 532, 47 S.Ct. at 444. It is clear that where the adjudicator has a substantial pecuniary interest in the outcome, the probability of actual bias is too high to be constitutionally tolerable. *Withrow* v. *Larkin,* 421 U.S. 35, 46-47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Gibson* v. *Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

"We do not believe that the Board, consisting as it does of five pharmacists and two lay persons as required by N.J.S.A. 45:14-1, creates a situation of probable bias in the regulation of pharmacists. The claim made by Rite Aid is similar to the argument advanced by the plaintiff in *Kachian* v. *Optometry Examining Board,* 44 Wis.2d 1, 170 N.W.2d 743, 747-48 (1969). In this argument Rite Aid is not claiming actual bias but rather contends that ' . . . there is an inbuilt, inescapable even if indirect, financial interest involved when [a pharmacist] board member sits in judgment on a fellow-[pharmacist].' *Kachian,* 170 N.W.2d at 747-48.

"Admittedly, the practice and conduct of a retail pharmacy primarily involves commercial activity in which various retail pharmacies compete for customers. Cf. *Virginia State Board of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). However, mere theoretical competition alone has never been a sufficient predicate for an inductive conclusion of probable economic bias. *Apoian* v. *State,* 235 N.W.2d 641 (S.D. 1975); *Blanchard* v. *Michigan State Bd. of Exam. in Optometry,* 40 Mich.App. 320, 198 N.W.2d 804 (1972); *Kachian* v. *Optometry Examining Board, supra.*

"Rite Aid, however, argues that *Gibson* v. *Berryhill, supra,* and *Wall* v. *American Optometric Association, Inc.,* 379 F.Supp. 175 (N.D.Ga.) (3 judge dist. ct.) aff'd mem. 419 U.S. 888, 95 S.Ct. 166, 42 L.Ed.2d 134 (1974), support its facial attack on the N.J.S.A. 45:14-1. We cannot agree.

"*Gibson* v. *Berryhill* involved a disciplinary proceeding against a non-self-employed optometrist who was not, and could not become a member of the Alabama Optometric Association. The disciplinary proceeding was conducted by the Alabama Board of Optometry whose members were limited by statute to members of the Association, which itself, limited its members to self employed optometrists. Thus, out of Alabama's 192 practicing optometrists, only the 100 Association members were eligible for appointment to the Board. On that record, the Supreme Court agreed 'that the pecuniary interest of the members of the Board of Optometry had sufficient substance to disqualify them, given the context in which [the] case arose.' 411 U.S. at 579, 93 S.Ct. at 1698.

"In *Wall* v. *American Optometric Association, Inc., supra,* the members of the Georgia State Board of Examiners in Optometry were traditionally chosen by the governor from among the members of the Georgia Optometric Association, a private organization which was composed of 'dispensing' as contrasted with 'prescribing' optometrists. Thus, out of Georgia's 300 optometrists, only the 200 members of the Association were eligible for appointment to the Board which regulated the practice of optometry. In this circumstance, the district court found that the board members had a substantial pecuniary interest and hence could not be 'called disinterested in the outcome of plaintiffs' license revocating proceedings.' 379 F.Supp. at 189.

"It is clear that both *Gibson* and *Wall* involve constitutional attacks addressed not to the face of the statutes involved, but rather to the manner in which they were applied. In neither case did the courts rest their holdings on the fact that mere board membership of individuals in the identical profession as those to be regulated, created a temptation to be biased.

"There is nothing that appears on the face of N.J.S.A. 45:14-1 to indicate the presence of that kind of substantial pecuniary interest which was found to disqualify board members in *Gibson* and *Wall.* As in *Gibson* and *Wall,* to determine if such an interest exists, we must look to more than the mere words of the statute. Evidence is required. Recognizing that the plaintiffs here attack the statute on both facial and 'as applied' grounds, we therefore ordered the taking of evidence to afford the plaintiffs an opportunity to prove, if they could, the existence of the required substantial pecuniary interest. We treat with that argument *infra.*

"In connection with the instant facial attack, however, we have been shown no basis for us to require the disqualification of board members just by reason of their sharing the same profession as plaintiffs. Nor have we been shown any authority which holds that, as a matter of law, mere self regulation of a profession without more, violates due process. We decline to so hold and therefore reject Rite Aid's facial argument." (Fns. omitted.)

In *Hortonville Dist.* v. *Hortonville Ed. Assn.* (1976) 426 U.S. 482, 491 [49 L.Ed.2d 1, 8, 96 S.Ct. 2308], the Supreme Court has recently reiterated general language about due process and disqualifying bias in one case cannot reliably be applied to another case without further analysis. "We must focus more clearly on first, the nature of the bias respondents attribute to the Board, and second, the nature of the interest at stake in this case."

The board contends in its closing brief that: "As expressed in a recent law review article: 'An analysis of the circumstances which permit conclusive presumptions of invalidity [because of the possibility of bias on the part of the decision-maker] indicates that it is the *degree* of monetary benefit accruing to the decision maker, or the *degree* of prejudgment, or the *degree* of previously formulated hostility or animosity which determines whether the decision is to be disregarded because of bias.' *F. Davis, Withrow* v. *Larkin* and the *'Separation of Functions' Concept in State Administrative Proceedings,* 27 Ad.L.Rev. 407, 409 (1975). Emphasis in original; footnotes deleted, brackets supplied."

In commenting upon the situation where there is a dealer and manufacturer dispute the majority points to the mandated dealer-board members. and the lack of counter balance in mandated manufacturer members. We must note on this point the appendix A to appellant's opening brief, a declaration concerning the drafting, negotiations and movement of the legislation creating the board. It declares: [¶] "One of the major issues . . . before successful passage was the question of adding manufacturer's representatives on the . . . Board." This was declined by their representatives allegedly because it would create potential antitrust liabilities. Thus the majority's claim that "The evil here lies in the state's insistence that under all circumstances the adjudicatory deck of cards be stacked in favor of car dealers" is negated. In this dissent I stress the importance of having members on the board with the expertise to understand all aspects of each case before it. Sans such members a board can become an ineffectual group directed in its deliberations and decisions by an executive officer or consultant.

I cannot accept the judgment of the majority which is predicated on an unfounded assumption of "antagonism" by the board toward manufacturers. The dealer-members have not been shown to possess a pecuniary interest which would bias them under any judicially accepted test. It has not been established that the board is not an impartial tribunal for franchise termination protests.

I would reverse the judgment.

A petition for a rehearing was denied June 15, 1977. Regan, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied August 4, 1977. Bird, C. J., was of the opinion that the petition should be granted.