**ORRIN W. FOX CO., a corporation, Muller Chevrolet, a corporation, and General Motors Corporation, Plaintiffs,**

v.

**NEW MOTOR VEHICLE BOARD OF THE STATE OF CALIFORNIA, Melicio H. Jacaban, Audrey B. Jones, John D. Barnes, John Onesian, Winfield J. Tuttle and John B. Vandenberg, as members of the New Motor Vehicle Board, Sam W. Jennings, as Executive Secretary of the New Motor Vehicle Board, Department of Motor Vehicles of the State of California, and Herman Sillas, as Director of the Department of Motor Vehicles, Defendants.**

No. CV 76–1200–WPG.

United States District Court,
C. D. California.

Sept. 14, 1977.

O'Melveny & Myers, Los Angeles, Cal., Hahn & Hahn, Pasadena, Cal., Norin T. Grancell, Los Angeles, Cal., for plaintiffs.

Evelle J. Younger, Atty. Gen., Robert L. Mukai, Deputy Atty. Gen., Crow, Lytle & Gilwee, Sacramento, Cal., for defendants.

## MEMORANDUM OF DECISION

Before ELY, Circuit Judge, and GRAY and TAKASUGI, District Judges.

WILLIAM P. GRAY, District Judge.

Plaintiffs General Motors Corporation and two retail automobile dealers in Southern California seek of this three-judge court a declaratory summary judgment that the California Automobile Franchise Act is unconstitutional on its face and as administered, and they seek a consequent injunction. This court has jurisdiction under 28 U.S.C. §§ 1331(a), 1337, 1343(3), and 2201. For reasons stated in this opinion, the requested relief will be granted.

The California governmental body now designated as the New Motor Vehicle Board (the Board) was created within the Department of Motor Vehicles by statute in 1967 and given responsibility for the licensing of new car dealers (California Vehicle Code §§ 3000 *et seq.*). In 1973, the California Automobile Franchise Act (the Act) added §§ 3060 to 3069 to the Vehicle Code, thereby giving the additional powers and functions to the Board that are challenged in this action.

Section 3062 provides that before an automobile manufacturer (franchisor) may establish an additional motor vehicle dealership (franchisee) or relocate an existing dealership, the franchisor must first give written notice of such intention to the

Board and to each dealer for the same "line-make" of automobile within the "relevant market area." Such area is defined as ". . . any area within a radius of 10 miles from the site of a potential new dealership." (Vehicle Code § 507).

Any dealer receiving such notice may, within fifteen days thereafter, file with the Board a protest to the establishing or relocating of the dealership. When such a protest is filed, the Board is obliged automatically to issue an order to the franchisor that the proposed establishment or relocation of the franchisee may not take place pending a hearing on the merits of the protest and a final decision by the Board.

It is a misdemeanor for a franchisor to establish or relocate a franchisee in violation of an order of the Board (Vehicle Code §§ 11713.2(1) and 40000.11), and such violation is grounds for suspension or revocation of the license of a manufacturer or dealer to do business in California (Vehicle Code § 11705(a)(10)).

Section 3066(a) provides that, "Upon receiving a notice of protest," the Board shall issue an order fixing a time for the hearing, which shall be commenced within sixty days following such order. As the foregoing describes, the receipt by the Board of a protest automatically triggers both the order staying the proposed action by the franchisor and the order setting the hearing. The statute does not specify clearly that the same communication shall contain both orders or, if not, when one shall be issued in relation to the other. Although in the present instance concerning plaintiff Orrin W. Fox Co., the Board waited six weeks after issuing the injunction (on May 29) before it sent out the order setting the hearing (on July 8), we are inclined to interpret the Act as requiring the injunction and the order to be promulgated concurrently.

The hearing may be conducted by the Board or by a hearing officer designated by the Board. Testimony of witnesses and documentary evidence may be presented by the parties, as well as by "other interested individuals and groups." (Vehicle Code § 3066(a)).

If the matter is heard by the Board and the Board fails to act within thirty days after such hearing, the proposed action is deemed to be approved (§ 3067). If the matter is heard by a hearing officer, he is required to prepare and submit in writing a proposed decision to the Board (Government Code § 11517(b)), and there is no time limit within which this must be accomplished. The Board may affirm or reverse the decision of the hearing officer, and, once again, if the Board does not act within thirty days, the proposed establishment or relocation of the franchisee is deemed approved (Vehicle Code § 3067). However, the Board may also decide to take additional evidence or refer the matter back to the hearing officer for further proceedings (Government Code § 11517(c)), in which event there is no time limit imposed other than the requirement that the decision be made ". . . within such . . . period as may be necessitated . . ." by the additional proceedings (Vehicle Code § 3067).

Thus, by the simple means of filing a protest, an automobile dealer can prevent a new competitor from being established, or an existing competitor from being relocated in new facilities, within ten miles of the protesting dealer for at least ninety days plus as long as it may take for a hearing officer to submit in writing a proposed decision and for the accomplishment of such additional proceedings as the Board may direct. Plans to establish a dealership in a particular location necessarily involve commitments for the purchase or lease of real property, construction or alteration of premises, and for the acquiring of personnel, equipment and stock in trade. Bearing these things in mind, an actual or potential delay of three months, and perhaps much more, brought about by the filing of a protest could seriously hamper or even completely destroy the consummation of such plans.

Little imagination is needed in order to visualize how appealing such a prospect might be to a competing automobile dealer, particularly, inasmuch as his protest need

not be accompanied by any showing whatever of probable success, irreparable injury if his protest is not granted, or a bond or any other undertaking.

The manner in which the passage of the Act and the administration thereof have affected the present plaintiffs is revealed in the uncontradicted affidavits and documentary exhibits submitted by the parties. The only Buick dealer in Pasadena terminated his franchise early in 1974, and a replacement dealer had not been established until May 1975, when plaintiffs General Motors and Orrin W. Fox Co. executed a franchise agreement. Protests promptly were filed by Buick dealers located in the nearby cities of Monrovia and San Gabriel on about May 22, 1975. On May 29, 1975, the Board sent letters to General Motors advising of the protests and stating that "you may not . . . establish the proposed dealership until the Board has held a hearing as provided for in Section 3066 Vehicle Code, nor thereafter if the Board has determined that there is good cause for not permitting such additional dealership." The letter also advised that the Board would later fix a time for the hearing and would advise accordingly. On July 8, 1975, the Board assigned the dates of August 11 and 12, 1975, for the hearing.

However, as the result of requests for continuance by the protesters and by stipulation, and protracted litigation in the courts concerning the right to take prehearing depositions, the protests were reset for hearing on September 15, 1976. They therefore were still pending when the present action was filed, on April 13, 1976.

The foregoing recital shows that, under the provisions of the Act, the protesters were able to prevent plaintiff Fox from being established as a potential (although geographically rather remote) competitor for more than fifteen months (including the entire 1976 Buick model year), without any official consideration being given to the merit or lack of merit of the protests. Fox understandably assesses at many thousands of dollars its damages occasioned by such delay.

Plaintiff Muller Chevrolet took over an existing dealership in the Montrose section of Glendale in 1973. It soon became apparent to Muller that its physical facilities were completely inadequate and rapidly deteriorating and that a move to a new and much larger location was mandatory. In December 1974, Mr. Muller learned that the location of the current Volkswagen dealership in the adjacent community of La Canada might become available. Negotiations were begun that were contingent upon the Volkswagen dealer finding a new site for his operation, and upon the ability of the parties to finance their respective moves. After a year of complex and time consuming negotiations, an agreement was reached in December 1975 and the required notice of intention to relocate was served upon the Board and the surrounding Chevrolet dealers on about January 16, 1976. A few days later, Chevrolet dealers in Pasadena and Tujunga, respectively, filed with the Board letters saying, in effect, no more than "I protest," and on February 6, 1976, the Board responded by enjoining the proposed relocation pending a hearing on the protests. About two weeks later, on February 23, 1976, the Board "tentatively" set the hearing for June 23 through 25, 1976, and on April 21, 1976, issued a formal order confirming those dates. It is worthy of note here that such hearing was scheduled for a time more than four months after the injunction had been issued.

It appears from a supplemental affidavit filed by Mr. Muller on September 17, 1976, that the scheduled hearing took place before a hearing officer and that the latter rendered a decision favorable to the proposed relocation on about August 20, 1976. Then began the thirty-day waiting period within which time the Board might act upon that decision before the proposed relocation could be deemed approved and the injunction finally lifted (Vehicle Code § 3067). On September 14, 1976, before the end of such waiting period, Muller was advised that the new leasehold premises were no longer available for his dealership because of his long failure to take possession

and otherwise assume the obligations of the lease. Muller thereupon "gave up" with respect to this litigation and is starting all over again in his attempt to find a new site for his business.

■ We find that the hereinabove described procedures mandated by the California statute are in gross violation of the Due Process Clause of the Fourteenth Amendment. As the Supreme Court has said, the right to the liberty proclaimed by that provision of the Constitution ". . . denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, . . . and, generally, to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). Certainly, the right to grant or undertake a Chevrolet dealership and the right to move one's business facilities from one location to another are included within this protection. Of course, the right to do these things is not unlimited. Legitimate conflicting interests of other individuals and of the public as a whole often require that restrictions be imposed. The Fourteenth Amendment requires only that such restrictions be administered in accordance with the procedural safeguards that have been established over the years as constituting due process of law.

■ One of the basic requirements of due process is that the "liberty" of a person may be curtailed only after a hearing. *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); see, *Mullane v. Central Hanover Bank*, 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). "[I]t is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment.

* * * * * *

The Fourteenth Amendment draws no bright lines around 3-day, 10-day, or 50-day deprivations of property. . . . While the length and consequent severity of a deprivation may be another factor to weigh in determining the appropriate form of hearing, it is not decisive of the basic right to a prior hearing of some kind."

*Fuentes v. Shevin*, 407 U.S. 67, 84–86, 92 S.Ct. 1983, 1996–97, 32 L.Ed.2d 556 (1972). Here, the plaintiffs were deprived of their rights for many months without any hearing whatever.

■ It is true, as the defendants point out, that there are extraordinary situations in which some valid governmental interest is at stake that justifies immediate interference with the rights of a person before a noticed hearing can be accomplished. For example, the Supreme Court has upheld statutes permitting governmental agencies summarily to seize operational control of banking institutions in serious financial difficulty. *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947). See also, *Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), in which a procedure for summary seizure of misbranded drugs by the Food and Drug Administration was upheld. But such procedures are justified only when a responsible public official concludes that to delay action pending a hearing would likely result in serious harm to the public. Here, there is no provision in the Act for any public official to exercise his discretion as to whether the public interest requires that immediate action be taken in advance of a hearing; instead, the injunction automatically follows a simple protest by a competitor.

■ There are, of course, instances in which concepts of due process will also permit private parties to obtain judicial orders that restrain their adversaries from taking actions pending a hearing to determine whether the challenged actions should be enjoined as being in violation of the legitimate interests of the complainants. But the party seeking such a restraining order must make a persuasive showing that to delay injunctive relief until after a hearing would result in irreparable injury to him, and that he would be likely to prevail in

such hearing. Even with such a showing, a pre-hearing restraining order is normally limited to ten days. *See*, for example, Rule 65(b) of the Federal Rules of Civil Procedure. There is also the normal requirement of a bond to insure the enjoined party against loss occasioned by an improvidently issued restraining order. None of these requirements of due process are provided for in the Act.

The defendants urge that the Act is not constitutionally defective in its operation because the plaintiffs could have filed and circulated their notices of intention early in their negotiations, and long before consummating their transactions, thus shortening or perhaps avoiding the delay between readiness to operate and the hearing. In the case of Muller, it appears that the negotiations for the lease of the new premises were protracted and involved many problems that were uncertain of satisfactory solution. It would hardly have been practicable for Muller to publish an intention to relocate, thus inspiring almost inevitable protest, and go through an expensive hearing without knowing that the desired premises were available. It is also not hard to imagine the dampening effect upon the negotiations that would be imposed by the awareness of the long delay in completion of the transaction that any irresponsible protest could inherently cause.

Apart from these practical considerations, the short answer to the defendants' contention is that the plaintiffs had a constitutional right to do what they wanted to do, subject only to the restrictions of due process herein discussed.

In light of the foregoing, it is evident to us that the Act is unconstitutional as being in violation of the Due Process Clause of the Fourteenth Amendment. Having upheld the plaintiffs' challenge on this ground, it is unnecessary for us to consider their alternative claim that the Act is invalid under the Supremacy Clause of the Constitution because it is in inherent conflict with the federal antitrust laws.

■ However, before rendering a judgment for the plaintiffs, we must resolve an additional problem that has been troubling us from the inception of this action, namely, whether or not principles of comity require, or even permit, that we abstain from adjudicating this matter. We are fully mindful of the teaching of Justice Black, in *Younger v. Harris*, 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971), that the notion of comity denotes ". . . a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." We are in complete accord with this concept, and we are aware that the courts of California are just as dedicated to preserving the principles of the United States Constitution as are we. Our decision in this matter has been withheld for several months in the hope that one of the cases pending against the Board in state courts would result in an adjudication that would deal with the constitutional problem here presented. However, this has not occurred,* and we are obliged to act, particularly in light of the rule laid down in *Wisconsin v. Constantineau*, 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971):

> ". . . abstention should not be ordered merely to await an attempt to vindicate the claim in a state court. Where there is no ambiguity in the state statute, the federal courts should not abstain but should proceed to decide the federal con-

---

* On May 23, 1977, the California Court of Appeal (Third District) affirmed a trial court ruling that the Act was unconstitutional because four of the nine members of the Board are required to be new car dealers, and thus presumably antagonistic to franchisors. *American Motors Sales Corp. v. New Motor Vehicle Board*, 69 Cal.App.3d 983, 138 Cal.Rptr. 594 (1977). The Legislature and the Governor promptly responded by enacting (on June 24, 1977) and approving (on July 7, 1977), an amendment to the Act which provides that only the non-new car dealer members of the Board may decide matters involving protests. The amendment made no other change in the procedures established by the Act.

stitutional claim. . . . We would negate the history of the enlargement of the jurisdiction of the federal district courts, if we held the federal court should stay its hand and not decide the question before the state courts decided it."

As is discussed above, we find the Act to be clearly unconstitutional, and there is no ambiguity that could be resolved in such manner as to harmonize it with the requirements of due process. Accordingly, a judgment declaring such unconstitutionality and enjoining enforcement of the provisions of the Act pertaining to protest procedure is being filed contemporaneously herewith. This opinion shall constitute findings of fact and conclusions of law, as authorized by Rule 52(a) of the Federal Rules of Civil Procedure.